EWING v. SCHULTZ. (Nos. 7502, 7885.)

(Court of Civil Appeals of Texas. Galveston. March 30, 1920. On Motion for Rehearing, April 20, 1920.)

1. Partnership ⬳258(8)—Evidence held to show that claim by partner against copartner's estate was personal and not partnership debt.

In a suit by a partner against the independent executor of a deceased copartner to recover payments made by plaintiff to the partnership on behalf of decedent, evidence held to support a finding that the debt sued for was an independent and personal obligation of decedent to plaintiff and distinct from any obligation of the partnership as such.

2. Limitation of actions ⬳46(2) — Statute runs against advances contingent upon sale of land when contingency happens.

Where decedent had deeded realty to plaintiff by absolute deed intended as security for past, present, and future advances, and it appeared from undisputed evidence that the

claim sued on by plaintiff was to be paid from moneys derived from royalties and leases of the land and from the proceeds of a sale thereof whenever such sale should take place, the claim was not barred by limitations, since the contingency which would set in motion the statute had not happened.

3. Mortgages ⬳109—Evidence held to sustain finding that debt was secured by mortgage sought to be foreclosed.

In a suit against an independent executor of a decedent's estate to recover an indebtedness and to foreclose an absolute deed given to secure such advances, evidence held to support a finding that the debt sued for was secured by such mortgage.

4. Executors and administrators ⬳222(1) — Claims need not be presented to independent executor within one year.

When an estate is being administered by an independent executor, it is unnecessary for a claimant against the estate to present claim to such executor for allowance or classification within one year; Rev. St. art. 3435, not applying.

5. Executors and administrators ⬳260—Statutory classification of claims inapplicable to independent executor.

An independent executor being the sole judge of what claims he will and what claims he will not allow and pay, Rev. St. arts. 3458, 3460, relating to classification of claims and the order of payment, have no application.

6. Executors and administrators ⬳7—Independent executors not under court's power.

The court has no control over an independent executor in the faithful performance of his duties as provided in the will, and the only action which that court is required or authorized to take is to probate the will which names the executor; he, if his powers are general, managing the estate and paying the debts as though they were his own.

7. Executors and administrators ⬳228(4)— Evidence held to show that claim was presented to independent executor in proper time.

In a suit against an independent executor to recover a debt owing plaintiff by decedent, evidence held to sustain a finding that, if presentation was necessary, the claim was presented to the executor for allowance in proper time.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Action by Gus Schultz against Presley K. Ewing, independent executor of the estate of John Lovejoy, deceased. Judgment for plaintiff, and defendant appeals. Affirmed, and rehearing denied.

Presley K. Ewing, of Houston, for appellant.

McMeans, Garrison & Pollard, of Houston, for appellee.

LANE, J. This suit was brought by appellee, Gus Schultz, against appellant, Presley K. Ewing, independent executor of the

estate of John Lovejoy, deceased, to recover upon a certain indebtedness alleged to have been contracted by John Lovejoy before his death; for a foreclosure of a lien given to secure payment of said indebtedness on certain lands belonging to said estate, and for a sale of such lands for the purpose of paying said indebtedness.

Plaintiff alleged the execution and delivery by John Lovejoy to him of a certain deed by which Lovejoy conveyed to him the land involved in this suit. It is further alleged, among other things, as follows:

"That said instrument (referring to the deed set out in the fourth paragraph) while upon its face an absolute deed was not in fact such, but was a mortgage or lien on said land and was executed and delivered by the said John Lovejoy and received and accepted by plaintiff as security for various sums of money then and theretofore loaned and advanced by plaintiff to the said John Lovejoy, and as security for interest at the legal rate upon the sums so advanced from the dates of such advancement, and was further intended as, and was security for, any other sums of money that might thereafter be loaned and advanced by plaintiff to the said John Lovejoy, and such understanding and agreement was had and made between them at the time of the execution and delivery of said instrument. And in this connection plaintiff alleges the facts to be that the land described in said conveyance was in what was then and afterwards thought by the said John Lovejoy, and now believed by plaintiff, to be in or near oil producing land near West Columbia in said Brazoria county, and believed by the said John Lovejoy to be of great value and ample security for any sums of money then due and owing by him to plaintiff and for any other sums that thereafter might be loaned and advanced by plaintiff to him, and so believing it was agreed by and between him and the plaintiff that the said conveyance should be a perpetual security for any and all sums of money that thereafter should be advanced by plaintiff to him, and for interest at the legal rate from the date of the loan and advancement of each of said sums, and it was then and at the time of the various loans and advancements then and thereafter made agreed that the same should be paid to plaintiff from proceeds of the sale of the lands described in said conveyance, or parts thereof, when the same should be sold, and from the proceeds of the sales of oil thereafter to be produced from said land when produced, and from the proceeds of royalties or bonus paid for the leases of said lands or parts thereof, when paid.

"That acting under said agreement plaintiff, prior to the death of the said John Lovejoy, advanced to and paid for and on account of the said Lovejoy various and sundry sums of money at the times and as per the items shown on the itemized statement hereto attached marked 'Exhibit A' and made a part hereof, aggregating the sum of $3,410.65, which includes interest calculated up to December 17, 1914, subject to credits for payments made in the following sums at the following dates: January 20, 1915, $761.64; April 24, 1915, $500; December 17, 1917, $1,587 (the last sum being paid by defendant Presley K. Ewing as independent executor)—aggregating $2,848.64, leaving a balance due thereon of $562.01, with interest thereon from December 17, 1914.

"That in the latter part of the year 1913 the said John Lovejoy and plaintiff entered into an enterprise or business venture, whereby they undertook to acquire the title to or holdings in certain lands in California, to accomplish which required a large expenditure of money from time to time by them, it being agreed at the time that each should own an equal interest in the property and should become responsible for equal amounts of the consideration to be paid therefor; and it was contemplated that plaintiff might be called upon by said Lovejoy to advance for him from time to time certain sums of money to enable the said Lovejoy to pay his part of the purchase consideration. That thereafter there was paid in on said enterprise by plaintiff and the said John Lovejoy the sum of $28,415.29, of which sum the plaintiff paid the sum of $17,769.53, and the said Lovejoy paid the sum of $7,123, whereby plaintiff paid for the said Lovejoy over and above the sum for which he, plaintiff, was responsible the sum of $10,645.76, which sum was owing by the said Lovejoy to the plaintiff at the time of his death, and in addition thereto interest at the legal rate upon each of the sums so paid by plaintiff for or to said Lovejoy from the date of payment. An itemized statement of the items paid by both plaintiff and the said Lovejoy showing the date upon which each item was paid is hereto attached, marked 'Exhibit B,' and an itemized statement showing which of the items and sums shown in Exhibit B were paid by the said Lovejoy is hereto attached, marked 'Exhibit C,' and both said exhibits are attached hereto and made parts hereof. And in this connection plaintiff avers that the said sums so paid by him for and to the said John Lovejoy were secured by the execution and delivery of the mortgage or lien in the form of an absolute deed hereinbefore referred to upon the land hereinbefore described, by the agreement hereinbefore alleged, which was made at the time of the execution and delivery of said instrument."

The account as shown by Exhibit A attached to the petition is not involved in this suit, and will not be further mentioned except in so far as it may become necessary to do so in discussing the assignments of error presented by appellant.

Answering plaintiff's petition, the defendant alleged as follows:

"(a) That with respect to the demand counted on in paragraphs 8 and 9 of plaintiff's petition herein, and in the Exhibits B and C thereof, such was not, nor was any part thereof, within the contemplation of the parties to the alleged security agreement when the same was made, if made, nor within their mutual intention, nor was such demand, or any part thereof, within the scope of such agreement, nor was such agreement applicable thereto; that the items of such demand, and each of them, were and are obligations and disbursements for and on account of a copartnership, joint-stock company or corporation, not in con-

templation when such alleged security agreement was made, if made, and not entered into until many years thereafter, and in which plaintiff Gus Schultz, the deceased John Lovejoy, and a third party, one Monta J. Moore, were equally interested, with holdings and operations in the state of California, involving among other interests a ranch, known as Pauma ranch, which enterprise has never been wound up, and no adjustment has ever been made of its affairs or among the parties at interest therein.

"(b) That said demand, so based on said Exhibits B and C as aforesaid, did not, nor did any item thereof, accrue within two years before the commencement of this suit, after deducting the period between the death of said John Lovejoy, to wit, October 4, 1916, and the qualification of this defendant as aforesaid independent executor of his estate, to wit, on November 10, 1916, and is barred by limitation under the statute in such case made and provided.

"(c) That it is not true that the alleged demand based on said Exhibits B and C was presented to this defendant as independent executor aforesaid within 12 months after his qualification as such, but the fact is that such was never presented to him as a claim or demand before suit; that plaintiff presented in regular course the demand paid and satisfied as aforesaid, claiming that the alleged security applied thereto, and making no claim of its otherwise applying; that in connection with other papers pertaining to said California copartnership, plaintiff handed to this defendant copies of memoranda similar to the items of said Exhibits B and C, but without the headlines thereof, and with headlines reading, 'Statement of Moneys Paid Out by Gus Schultz of Galveston, Texas, on Account of Pauma ranch transaction,' and without any claim or demand for allowance, approval or payment thereof, and which naturally would be understood by this defendant as furnishing information of disbursements as to said California copartnership, and which were so understood, accepted and retained, and not otherwise, and therefore this defendant submits that such demand, if otherwise valid, is to be postponed in payment in accordance with the statutes in such case made and provided.

"(d) That numerous unsecured creditors of said John Lovejoy have in due course presented their claims to this defendant as independent executor aforesaid, which have been allowed, amounting to thousands of dollars, but same remain unpaid, and his said estate has not sufficient money or assets in hand or capable of being realized on to pay the same, and there are no such money or assets belonging to said estate sufficient to pay the same in full, and the amounts receivable by them will be, more or less, according to the allowance and classification of the plaintiff's demand in this behalf."

The case was tried before the court without a jury, and judgment was rendered in favor of plaintiff for the sum of $13,633.26, same being the amount shown by Exhibits B and C, together with legal interest thereon to date of judgment. It was further adjudged that the deed by Lovejoy to Schultz, of date July 20, 1916, was a mortgage lien upon the land involved, as well as upon all rents, royalties, or moneys otherwise derived in any manner from said land, and that said lien was given to secure the indebtedness sued upon, and therefore it was further adjudged that said lien be foreclosed, and that said land be sold in satisfaction of said judgment, and that, if the proceeds of such sale should be insufficient to pay the judgment in full, then, in that event, any balance remaining unpaid should be paid by the defendant executor in due course of administration of the estate of John Lovejoy.

Appellant Ewing, complaining of the judgment rendered, submits the following contentions:

First. That it appears from both the pleadings and undisputed evidence that appellee's suit is one for contribution by a partner on a partnership overpayment, the affairs of such partnership having not been wound up, the partnership assets not administered, nor the accounts thereof settled, so far as shown, and therefore the court erred in rendering judgment for appellee.

Second. That if it be conceded that the debt sued on was the individual debt of John Lovejoy and not a firm or copartnership debt or liability, still it was error for the court to render judgment for appellee for the reason that all of the claim sued upon, except the sum of $1,133.44, was, when said suit was filed, barred by limitation as pleaded by appellant and established by the evidence.

Third. That "the court erred in giving judgment for the plaintiff as done, with establishment and foreclosure of a lien on the land in question, over the defense pleaded by the defendant and established by the evidence that the demands recovered on herein were not within the contemplation or scope of the oral agreement for security made contemporaneously with or before the delivery of the purported deed in evidence."

Fourth. That "the court erred in allowing the demands counted on or any of them, in establishing and foreclosing a lien on the land in question, in priority of the general creditors; for that, the claim recovered on was not legally exhibited to the executor within the year, as by the statute in such case required."

Fifth. That the court erred in adjudging that any balance of the judgment remaining unpaid after the proceeds of the sale of the land had been exhausted, if any, should be paid by appellant, executor, in due course of administration of the estate, in that the pleadings of the plaintiff and the undisputed evidence show that, if there was an individual undertaking by John Lovejoy to pay the demand in question, it was only to pay same in so far as the security would pay it, and not otherwise.

Replying to the contentions of appellant, appellee insists:

First. That the suit of appellee was one for the recovery of a personal debt owing by John Lovejoy to him for advancement of money under an agreement shown by the undisputed evidence, and therefore the rule invoked by appellant by his first assignment, relating to partnership accounting, has no application.

Second. That "it having been agreed by Major Lovejoy and Mr. Schultz, at the time of the execution and delivery of the mortgage in form of a deed, that the sums of money theretofore owing, then advanced and thereafter to be advanced, would not be payable or become due until the same could be paid out of the proceeds of the sale of the mortgaged lands, or out of the lease rentals, or out of bonuses paid for leases, and the evidence showing that none of the advances sued for had been or could have been paid in that way, the contingency that would have matured the debt, so as to set the statute of limitation in motion, has not happened."

Third. That "the plaintiff pleaded, and the evidence established, that the mortgage in question was intended by Lovejoy and accepted by Schultz, as security for advances of money thereafter to be made by him, it being then contemplated that such advances would be made; and that the advances to him by Schultz of money which went into the Pauma ranch transaction was recognized by Lovejoy as secured by the mortgage under the agreement made between them at the time of its execution."

Fourth. That "the evidence was sufficient to raise the issue and warrant a finding that Schultz duly presented to Mr. Ewing, as executor of the estate of John Lovejoy, deceased, his claim against Lovejoy's estate, as evidenced by Exhibits B and C, within one year after Lovejoy's death and the qualification of his executor; and the court having found for plaintiff on this issue, the judgment will not be disturbed."

Fifth. That "in the absence of any proof of an agreement between Lovejoy and Schultz that the latter should look only to the proceeds of the sale of the mortgaged lands for repayment of the advances, and not to Lovejoy individually, the provision in the judgment which ordered that if the proceeds of the sale be insufficient for its payment, and there should be a balance remaining unpaid after the proceeds of the sale should be applied to the payment thereof, then such balance should be paid in due course of administration, was proper."

Miss Rachel Malevinsky, who, from 1902 to 1913, was Major Lovejoy's secretary and stenographer, and who had charge of his personal matters and of his clerical and stenographic work, and who had charge of the keeping of his books and private accounts and transactions of that kind, and who was familiar with his private matters, private business transactions, and private accounts, and to whom such matters were left for attention, and who wrote the deed in question, testified:

"I know something about the execution of the deed which has been introduced in evidence from Mr. Lovejoy to Mr. Schultz. I am the notary that took Mr. Lovejoy's acknowledgment; I wrote said deed. At the time of the execution of said deed, Mr. Lovejoy owed Mr. Schultz some money. The understanding between Mr. Lovejoy and Mr. Schultz at the time of the execution of said deed was to be a mortgage, as security. The understanding at the time was that this mortgage should protect Mr. Schultz in any present or future indebtedness that might arise or come up between the two; Mr. Schultz was to hold it as long as there was any indebtedness due or any transactions pending. That applied to any and all transactions between them.

"This indebtedness, whatever it might be, that Mr. Lovejoy owed Mr. Schultz, was to be paid out of the proceeds received from this Columbia land, either from royalty, leases, or a sale of it, not at any particular time, but just as the transactions were closed it was to be applied on this indebtedness. There were other indebtednesses that Mr. Lovejoy owed Mr. Schultz, and as Mr. Lovejoy sold any of this property it was to be applied on Mr. Lovejoy's indebtedness to Mr. Schultz. Mr. Lovejoy sold several pieces and leased several pieces. There was no particular time when the money that Mr. Schultz advanced or should advance was to be paid, but, just as the property was disposed of, the agreement or understanding between them was that the proceeds would be applied upon the indebtedness, whatever it was.

"I was acquainted with the statements and the accounts between Mr. Lovejoy and Mr. Schultz. I kept that account for Mr. Lovejoy. I have had occasion to examine the account between Mr. Lovejoy and Mr. Schultz. I did not furnish the statement that is now shown me; that is Mr. Schultz's statement. I went over said statement and checked it with my books showing the indebtedness between Lovejoy and Schultz. I have examined said statement to see whether or not it is a copy of the statement that is attached to the petition. Said statement is correct, all except one item of $520 that Mr. Lovejoy paid, which was a note that Mr. Lovejoy and Mr. Schultz indorsed for Mr. Moore, and they had to pay it, and they each paid their pro rata one-half, and I did not give Mr. Lovejoy credit for the $520. That was a personal matter; it was not included in this. I have gone over the exhibit attached to the petition, and checked it against my books, and it is correct with the exception of the $520. I made such check both during Mr. Lovejoy's lifetime and after. * * * Mr. Lovejoy at the time he went over said statement approved it as correct, with the exception of the $520. He did not have that in there at that time. Mr. Schultz was under the impression that he had credited Mr. Lovejoy with that $520, when I explained to him I did not consider it as a part of this transaction. As I did not enter that $520 on Mr. Lovejoy's accounts, it should not have been entered on Mr. Schultz's, and so that ought to come off of Mr. Schultz's. Mr. Schultz's statement is $10,645.76, and there should be a credit on that amount of $520, leaving a balance of $10,125.76.

"Mr. Lovejoy during his lifetime dictated to me a letter to Mr. Gus Schultz, at Galveston, with reference to the West Columbia property. The letter was addressed to Mr. Schultz and was dictated to me. Mr. Moore signed the letter and Mr. Lovejoy ratified it in his own handwriting. Said letter was with reference to the security for indebtedness that Mr. Lovejoy owed Mr. Schultz. That was after the original agreement, and after the delivery of the deed.

"In conversation subsequent to the time of the execution and delivery of the deed, I have

heard Mr. Lovejoy repeatedly tell Mr. Schultz that he considered him fully protected in any indebtedness that he (Lovejoy) owed him (Schultz), or might owe him, by having this West Columbia land as security; that he (Lovejoy) considered the West Columbia a big oil field, and Schultz would more than get his money from it.

"At the time the deed was executed originally, it was agreed that it would extend to any future indebtedness and cover any future indebtedness.

"In the keeping of accounts, I kept separate accounts, because Mr. Monta Moore was interested in the Pauma ranch, and I did not want to mix up the accounts. I wanted to keep the Pauma ranch account separate, therefore I kept it in a separate book. Time and again Mr. Lovejoy made the remark that the West Columbia land secured all indebtedness.

"Mr. Moore's interest in the California proposition was that, when Moore and Schultz and Lovejoy went into that deal, Moore was to go to California to attend to the matter, and Schultz and Lovejoy were to advance the money. They gave Moore the money to go there on, and he was to look after their interest because they could not go out there themselves. Schultz and Lovejoy were to put up all the money equally, and half and half. It was a tract that covered probably 12,000 acres of land. When it became self-paying, Schultz and Lovejoy were to be reimbursed, principal and interest, and then Moore was to participate to the extent of a third. The transaction was a failure, an entire loss. The agreement was that Schultz and Lovejoy were to bear this California proposition equally, and Lovejoy was not able to bear his pro rata, and the $10,125.76 is the amount of money that Mr. Schultz advanced to Mr. Lovejoy for that purpose, and Schultz advanced it with the understanding that it was to be paid back out of the security he held, which was the Columbia land."

### Cross-Examination.

"When the original transaction was had, at the time the deed from Lovejoy to Schultz, which has been introduced in evidence, was executed and delivered, the California—or Pauma ranch—transaction had never been spoken of or contemplated. That came up years afterwards, in either 1910 or 1911. The California transaction was a partnership, as I have stated.

"In the conversation that Mr. Lovejoy and Mr. Schultz had in the beginning, when the deed in question was delivered, the words they said were substantially that it was to protect Mr. Schultz in any indebtedness that Mr. Lovejoy might owe, past, present, or future. Mr. Schultz and Mr. Lovejoy had had transactions together from long years ago, long before Mr. Lovejoy moved to Houston—in Galveston. Mr. Lovejoy may not have used those words, 'present, past, and future,' but he said any indebtedness he might owe Schultz. I have heard Mr. Lovejoy make that statement again and again. Mr. Lovejoy did owe Mr. Schultz some indebtedness at that time, and all through the intervening years; ever since I was in the office there was always an account between Lovejoy and Schultz. * * *

"At the time of the execution of the deed in question, it was to be security for any indebtedness Lovejoy might owe Schultz in the future; it was a running security. Lovejoy wanted Schultz always to feel he was secured. No matter what happened, Lovejoy wanted Schultz to have it as security for advance in the future."

Again:

"At the time the deed was executed originally, it was agreed that it would extend to any future indebtedness and cover any future indebtedness. * * * In the conversation that Mr. Lovejoy and Mr. Schultz had in the beginning, when the deed in question was delivered, the words they said were substantially that it was to protect Mr. Schultz in any indebtedness that Lovejoy might owe, past, present, or future."

The undisputed evidence shows that the estate of Lovejoy was indebted to Schultz in the sum found to be due by the trial court.

[1] We think the evidence was amply sufficient to sustain the contention made by appellee in reply to the first assignment of appellant. We think the evidence amply supports a conclusion that the debt sued for was an independent and personal obligation of Lovejoy to Schultz and distinct from any obligation of the partnership of Lovejoy, Schultz, and Moore. This being true, Schultz could sue Lovejoy if living, or his representative since he is dead, as he did.

In 15 Ency. Pleading & Practice, 1034 and 1035, it is said:

"It is a general rule often announced that where the cause of action is distinct from the partnership accounts, and does not involve their consideration or require their examination, an action at law will lie thereon between partners. The several classes of cases herein considered, in which the general rule prohibiting actions at law between partners is not applicable, have often been rested upon this principle. But in each instance the reason that partnership accounts are not involved is simply because the rights and obligations sought to be enforced are the individual rights and liabilities of the partners and not firm demands or liabilities, and this seems to be the real reason why the general rule is not applicable to these classes of cases."

Lockhart v. Lytle, 47 Tex. 453:

"The petition seeks to recover contribution for certain expenditures of money and labor by a partner, for the use of the partnership, without going into a settlement of the partnership accounts; and the authorities are that such a suit cannot be maintained, at least not without showing a special agreement, or a separation of the transaction from partnership accounts. Collyer on Partnership, § 284; Parsons on Partnership, 286; 1 Story's Eq. § 664."

30 Cyc. pp. 469, 470:

"When by an express agreement partners separate a distinct matter from the partnership dealings and one expressly agrees to pay the other a specified sum for that matter, assumpsit

will lie on the agreement although the matter arose from the partnership dealings. The action is also maintainable, during the existence of a partnership, for the recovery by one partner of money contributed by him to the firm which the other partner was bound to contribute."

See, also, 20 R. C. L. p. 926; Currier v. Rowe, 46 N. H. 72; Chamberlain v. Walker, 92 Mass. (10 Allen) 429; Bull v. Coe, 77 Cal. 54, 18 Pac. 808, 11 Am. St. Rep. 235; Lane v. Tyler, 49 Me. 252; Van Ness v. Forrest, 12 U. S. (8 Cranch) 30, 3 L. Ed. 478.

[2] We also overrule the second contention of appellant. The claim sued on was not barred by limitation. The undisputed evidence shows that the claim sued on was to be paid from moneys derived from royalties and leases of the mortgaged land and from the proceeds of a sale thereof, whenever such sale should take place. We quote from the following authorities:

17 R. C. L. § 21, p. 755:

"Where some condition precedent to the right of action exists, whether it be a demand and refusal or some other act or contingency, the cause of action does not accrue, nor the statute begin to run, until that condition is performed. Thus if a debt is not absolutely or presently due, but either the obligations to pay or the time of payment is contingent on the performance of some act, the happening of some event or the lapse of a specified period of time, then the happening of the event is a condition precedent to the present obligation to pay and the debtor is not in default nor the creditor entitled to call for performance until the condition is fulfilled and the statute cannot begin to run until that time."

Stribling v. Moore, 33 Tex. Civ. App. 297, 76 S. W. 593:

"This court, in National Cotton Oil Co. v. Taylor, 45 S. W. 478, in construing a contract of sale of seed which contained a promise to pay for the seed when the same was weighed, held that limitation commenced to run, not from the date of sale, but from the time when the weight was ascertained. The facts as stated in Robertson v. Cates, 74 Tex. 409, 12 S. W. 54, show that a note was given which was to be paid in six months from date, but also contained a recital that it was not to be paid until title was furnished and placed of record. It was there held that limitation commenced to run only from the time of the happening of the event called for in the contract. In Stevens v. Lee, 70 Tex. 281, 8 S. W. 40, it is held that limitation would not commence to run until a repudiation of the contract. The principle decided by these cases is that the cause of action does not accrue until the happening of the contingency upon which the extent of liability is made to depend, and that if, at the instance of the defendant, the happening of the condition is postponed, and liability thereafter repudiated and denied by him, limitation will then commence to run from the time of such denial and repudiation."

To the same general effect, see 25 Cyc. p. 1072; Cook v. Carpenter, 212 Pa. 165, 61 Atl. 799, 1 L. R. A. (N. S.) 916, 108 Am. St. Rep. 854, 4 Ann. Cas. 723.

[3] We overrule the third contention of appellant. The evidence amply supports a conclusion that the debt sued for was secured by the mortgage.

[4] We overrule the fifth contention of appellant. When an estate is being administered by an independant executor, as here, it is wholly unnecessary for one holding a claim against the estate to present it to such independent executor for allowance or classification within one year. The provision of article 3435, Revised Statutes, requiring claims for money against a testator or intestate to be presented to the executor or administrator within 12 months after the original grant of letters testamentary, or of administration, etc., has no application to the present case.

[5] Neither can article 3458 nor 3460 be invoked in support of appellant's contention. In such cases as the one now being considered, the independent executor is the sole judge of what claims he will and what claims he will not allow and pay.

[6] The court has no control over an independent executor in the faithful performance of his duties as provided in the will of his testator. The only action which that court is required or authorized to take in such cases is to probate the will which names the executor. If the powers conferred upon the independent executor by the will are general, he is to manage the estate and pay the debts as though both the estate and debts were his own, and therefore the formalities of swearing to and presenting the claim for allowance could accomplish nothing, as the statute prescribes another mode for the collection of such claims. Smyth v. Caswell, 65 Tex. 382; Taylor v. Davidson, 120 S. W. 1018; Howard v. Johnson, 69 Tex. 657, 7 S. W. 522; Pleasants v. Davidson, 34 Tex. 461; Evans v. Taylor, 60 Tex. 422; Osborne & Co. v. Robinson, 35 S. W. 327; Huppman v. Schmidt, 65 Tex. 585.

In Smyth v. Caswell, supra, it is said:

"When the statute says that no executor shall allow any claim for money against his testator, nor shall any county judge approve the same, unless accompanied by an affidavit, it clearly refers to an allowance which is to be followed by a presentation of the claim to the county judge for approval. As the county judge has nothing to do with approving claims when the estate is not administered in his court, it follows that the necessity for verifying and presenting to the executor does not exist. Chief Justice Wheeler remarked, in Wood v. McMeans, 23 Tex. 418, that 'allowance and approval would be of no avail unless the probate court had jurisdiction for the purpose of administering the estate, so that the claim could be docketed and paid in due course of admin-

istration.' The allowance being of no avail as preliminary to the collection of the claim, there is no necessity to make the affidavit to obtain it. Allowance and approval in an ordinary administration amounts to judgment, does away with the necessity for suit and saves costs, but, in the case of an independent executor, if, after allowance, the claim is not paid, there is the same necessity for suit as if the claim had not been allowed. * * * We think, therefore, that the intention of the Legislature was not to require the verification and presentation of a claim to an independent executor before suing upon it."

The court also says:

"When, however, the probate law has nothing to do with the management of the estate, these comments have no application or binding force. The testator chooses his own trustee and confides to him the decision as to the justice of alleged claims against his estate, subject only to any provisions he may have made upon the subject in his will and to the general law of the land."

In Taylor v. Davidson, supra, it is held that the presentation of a claim to an independent executor is not a condition precedent to a suit thereon against him.

In Howard v. Johnson, supra, it is said:

"What we have said with reference to the allowance and approval of claims does not apply to the allowance and approval in this case. Sorley being an independent executor, the approval of the county judge was a mere nullity."

In Evans v. Taylor, and Osborne v. Robinson, supra, it is said that the community survivor occupies a position like that of an independent executor, and the allowance and approval of the claim in such case does not give it any superiority over other claims of the same class.

Independently, however, of what has been said, there is another very cogent reason why the fifth assignment should be overruled. Plaintiff Schultz testified as follows:

"After Lovejoy's death, I presented my accounts to Mr. Ewing, both of them, for all that Lovejoy owed me, as to the Columbia property and the California property. That was within one year after Lovejoy's death. At that time I asked Judge Ewing if it was necessary to swear to them, and he said, no, that if it did become necessary he would let me know in time.

"As to Judge Ewing's statement having reference to the account he paid, I filed both accounts at the same time, and I handed Ewing everything in connection with my claim. I handed him the statement in connection with the Pauma ranch as a claim against the estate."

[7] Under such evidence the trial court would have been justified in finding that the claim in question was presented for allowance in proper time, even if such presentation was a necessary precedent.

We also overrule the fourth and sixth assignments of appellant.

Having reached the conclusion that no reversible error was committed in the trial of this cause, the judgment is in all things affirmed.

Affirmed.

PLEASANTS, C. J., not sitting.

On Motion for Rehearing.

LANE, J. In our original opinion we copied from the plaintiff's petition the following allegation:

"That thereafter there was paid in on said enterprise by plaintiff and the said John Lovejoy the sum of $28,415.29, of which sum the plaintiff paid the sum of $17,769.53, and the said Lovejoy paid the sum of $7,123, whereby plaintiff paid for the said Lovejoy over and above the sum for which he, plaintiff, was responsible, the sum of $10,645.76, which sum was owing by the said Lovejoy to the plaintiff at the time of his death, and in addition thereto interest at the legal rate upon each of the sums so paid by plaintiff for or to said Lovejoy from the date of payment. An itemized statement of the items paid by both plaintiff and the said Lovejoy showing the date upon which each item was paid, is hereto attached marked 'Exhibit B,' and an itemized statement showing which of the items and sums shown in Exhibit B were paid by the said Lovejoy is hereto attached marked 'Exhibit C,' and both said exhibits are attached hereto and made parts hereof."

Appellant Ewing has filed his motion for rehearing, and also a motion asking us to find that the allegations above set out are uncontroverted facts. This we decline to do. It will be observed that the effect of such allegation is to allege that both plaintiff Schultz and Lovejoy paid into the enterprise mentioned $28,415.29; that of this sum Schultz paid $17,769.53; and that Lovejoy paid $7,123, whereby Schultz paid for Lovejoy the sum of $10,645.76. These allegations present absurd contradictions, for when you add together the sum of $17,769.53, alleged to have been paid by Schultz, and the sum of $7,123, alleged to have been paid by Lovejoy, you have only the sum total of $24,892.63, and not $28,415.29 as alleged. However, it is alleged that Schultz paid for Lovejoy $10,645.76, and in addition thereto interest thereon at the legal rate. It is then alleged that an itemized statement of the items paid by both parties is attached to the petition marked "Exhibit B," and also an itemized statement showing which of the items and sums shown in "Exhibit B" were paid by Lovejoy, marked "Exhibit C"; that both of said exhibits are attached to the petition and made parts thereof. These allegations are ambiguous and obviously incorrect. When we look to "Exhibit B," it is shown that every item thereon, amounting to $28,415.29, was paid

by Schultz alone, and that none of the items therein are found in "Exhibit C," which is shown to be the items paid by Lovejoy, which amount to the sum of $7,123.77. The total of these two exhibits is $35,539.06. When the petition is read as a whole, we think it clearly appears that plaintiff intended to and in fact did allege that he paid into the enterprise for Lovejoy the sum of $10,645.76. The allegations above referred to were not excepted to by defendant.

The undisputed testimony of Miss Malevinsky was that the sum of $10,125.76 was advanced by Schultz to Lovejoy, and this together with interest thereon was the amount of the judgment rendered by the court. Appellant Ewing made no contention in the trial court, nor in this court until upon motion for rehearing, that the pleading and evidence were not sufficient to support the finding that Schultz had advanced to Lovejoy the sum of $10,125.76 as found by the court. As before stated, the amount advanced by Schultz to Lovejoy was not a disputed question until, for the first time, on motion for rehearing in this court. The defenses urged by appellant Ewing in both courts were based upon wholly different grounds from the contention now made with reference to the amount advanced by Schultz to Lovejoy.

Both the motions for rehearing and for additional findings of fact are overruled.